USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DCC #: _____
DATE FILED: 2/13/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SOPHIA JOHNSTON,                              :

                          Plaintiff,          :        **REPORT AND**
                                                       **RECOMMENDATION TO**
              -against-                       :        **THE HONORABLE**
                                                       **VALERIE E. CAPRONI**
CAROLYN COLVIN, ACTING                        :
COMMISSIONER OF SOCIAL SECURITY,                       13cv2710-VEC-FM
                                              :

                          Defendant.
-------------------------------------------------------X

**FRANK MAAS,** United States Magistrate Judge.

        Plaintiff Sophia Johnston ("Johnston") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for Social Security Disability benefits

("SSD").  The parties have filed cross-motions for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I

recommend that Johnston's motion (ECF No. 14) be denied, and the Commissioner's

cross-motion (ECF No. 27) be granted.

I.      Background

        A detailed recitation of the non-medical and medical evidence may be

found in the parties' motion papers.  (ECF No. 15 ("Pl.'s Mem."); ECF No. 28 ("Def.'s

Mem.")).  In brief, that evidence reflects that Johnston was born in 1963.  (R. 38).[1]  At age nine, she was diagnosed with acute lymphoblastic leukemia, and, in 1984, at age twenty-one, she had a relapse and a stroke that resulted in total right hemiplegia.[2]  (Id. at 51; see also id. at 421, 579).  Johnston also suffers from hypothyroidism, and had fractured her left hip as a child.  (See, e.g., id. at 468, 470).  With physical therapy, she was able to earn a bachelor's degree in nursing and science, and to work as a pediatric home care nurse until she had a high-risk pregnancy in 2000.  (Id. at 40, 42, 421).  After giving birth to triplets, Johnston did not work again until 2006.  (Id. at 42, 272).  Then, she began working on a substitute basis as a school nurse.  She worked approximately one to three days each month until she suffered a fractured wrist during a fall in 2011.  (Id. at 41-43, 417, 513-26).

Johnston alleges that she became disabled on January 1, 2006, and is limited in her ability to work due to chronic pain, bad balance, and deterioration and arthritis in her left hip, a meniscal tear in her right knee, "weakness in the right side," and leg, lower back, and neck pain.  (Id. at 42, 45-46).  Despite these difficulties, she often would walk for fifteen to twenty minutes at a time, and was the principal caregiver for her children.  (Id. at 46-47).

---

[1]     "R." refers to the certified copy of the administrative record filed together with the Commissioner's Answer.  (ECF No. 6).

[2]     Hemiplegia refers to "paralysis of one side of the body."  The Sloane-Dorland Annotated Medical-Legal Dictionary, 333 (1987).

On January 5, 2012, Johnston filed an application for SSD, in which she alleged that she was disabled as of January 1, 2006.  (Id. at 123-24).  After her application was denied initially on May 2, 2012, (id. at 73-80), Johnston requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 82).  On October 23, 2012, Johnston and her attorney appeared before ALJ Dale Black-Pennington for that hearing.  (Id. at 33-64).  On November 5, 2012, the ALJ found that Johnston was not disabled.  (Id. at 19-31).  The ALJ's decision became the final decision of the Commissioner, when, on March 8, 2013, the Appeals Council affirmed his decision.  (Id. at 1-7).  Johnston then filed this action on April 24, 2013.  (ECF No. 1).

II.     Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

III.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL 1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527). In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920.

The Second Circuit has described this familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider h[er] disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008). The claimant bears the burden of proof with respect to the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the claimant sustains their burden at each of these steps, then the burden shifts to the Commissioner at step five. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). When reviewing the medical

5

evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312

F.3d at 588; see also Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts

within the evidence, their resolution is a matter committed to the Commissioner's

discretion.  See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing

Veino, 312 F.3d at 588).

IV.     ALJ Decision

            In his decision, the ALJ determined at Step One of the required analysis that

Johnston had not engaged in substantial gainful activity during the period between

January 1, 2006, and March 31, 2007, which was her date last insured.  (R. 24).  At Step

Two, the ALJ found that Johnston's hip disorder and surgically-repaired right meniscus

were severe impairments, but that her "status post stroke," hypothyroidism, and leukemia

were not severe impairments.  (Id. at 24-25).  The ALJ further found at Step Three that

Johnston's impairments did not meet or medically equal the severity of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. at 25).  At Step Four, the

ALJ determined that through her date last insured, Johnston could not perform any past

relevant work, but had the residual functional capacity ("RFC") to "perform light work."

(Id.).  Finally, at Step Five, the ALJ concluded, based on the testimony of a vocational

expert, that Johnson had the RFC to perform jobs that existed in sufficient numbers in the

national economy, citing three "representative occupations."  (Id. at 29-30).  This, in turn,

dictated a finding that Johnston was not disabled.  (Id. at 30).

V.     Discussion

As the ALJ correctly indicated, (id. at 22), Johnston must establish disability prior to her date last insured to be entitled to benefits.  See Arone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989).  Here, it is undisputed that this date was March 31, 2007.  (Pl.'s Mem. at 1, n.1; Def.'s Mem. at 2, n.3).  Thus, the question presented by the cross-motions is whether the ALJ's decision that Johnston was not disabled within the meaning of the Act between January 1, 2006 and March 31, 2007, is legally correct and supported by substantial evidence.

In her papers, Johnston alleges that this case should be remanded because: (a) the ALJ erred by failing to follow the "treating physician rule;" (b) the ALJ erred in determining Johnston's RFC; (c) the ALJ erred in assessing Johnston's credibility; and (d) new evidence first submitted to the Appeals Council undermines the ALJ's decision. None of these claims warrant remand, much less the order reversing the Commissioner and remanding solely for the calculation of benefits that Johnston seeks.

A.     Treating Physician Rule

Johnston's first argument is that the ALJ erred by according "little weight" to an opinion that her treating physician, Dr. Sumita Mazumdar, rendered in 2012 regarding her disability status prior to March 31, 2007.  Specifically, Johnson contends that the ALJ failed to cite any specific facts that would justify his decision to accord Dr. Mazumdar's opinion less than controlling weight, thereby violating the treating physician rule.  (Pl.'s Mem. at 8-11).

1.     Applicable Law

The treating physician rule requires an ALJ "to grant controlling weight to the opinion of the claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence."  Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  As the Second Circuit has explained, a treating physician's opinion typically is accorded special consideration because of the "continuity of treatment he provides and the doctor/patient relationship he develops" with the claimant, which "place[s] him in a unique position to make a complete and accurate diagnosis of his patient."  Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).  Indeed, even a "treating physician's retrospective diagnosis . . . is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non medical evidence."  Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003) (quoting Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991) (emphasis added)).

Notwithstanding the deference customarily accorded to treating physicians, the Commissioner need not grant "controlling weight" to their opinions regarding the ultimate issue of disability, as this decision rests exclusively with the Commissioner.  See 20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  As to other issues, in deciding what weight to give to the opinion of a treating physician, the Commissioner must consider a number of factors, including the length of the treating

8

relationship and the frequency of examinations, the extent of any supporting evidence,

such as laboratory reports, and the consistency of the opinion with the record as a whole.

See 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-2p, 1996 WL 374188 (July 2, 1996).

 The Commissioner must further provide "good reasons" for the weight, if

any, he gives to a treating physician's opinion.  20 C.F.R. § 404.1527(c)(2).  If the ALJ

fails to apply the correct standard in weighing a treating physician's opinion or fails to

give good reasons for rejecting the opinion, a remand for further fact finding is the

appropriate remedy.  Halloran, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734

(RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d

at 506).

  2. Application of Law to Facts

 In this case, Dr. Mazumdar began treating Johnson regularly in early 2003.

On May 22, 2012, Dr. Mazumdar completed a Multiple Impairment Questionnaire which

evidently was sent to her by Johnston's counsel, Binder & Binder.  (R. 504-11).  In that

questionnaire, Dr. Mazumdar indicated that Johnston was in "stable" condition despite

her stroke (referred to as a "CVA") and leukemia, but that her condition would get

progressively worse over time.  (Id. at 504).  Dr. Mazumdar further suggested that this

diagnosis was supported by unspecified laboratory tests, as well as Johnston's "constant

pain" and "loss of motor skills."  (Id.).  Dr. Mazumdar opined that Johnston had the RFC

to stand and walk for only an hour or less during an eight-hour workday, to sit for only

half an hour or less before she would need to "get up and move around" for ten minutes,

and to occasionally lift and carry no more than five pounds, but that she could not push, pull, kneel, bend, or stoop, and that she had marked imitations in her ability to grasp objects, manipulate her fingers, and reach with her arms.  (Id. at 506-08, 510).  Dr. Mazumdar also stated that Johnston's conditions would require she take unscheduled thirty-minute breaks up to three times per day, necessitate at least three unscheduled work absences per month, and prevent her from performing any full-time job in which she needed to her to hold her neck in a constant position.  (Id. at 508-10).  Finally, Dr. Mazumdar opined that Johnston was "[i]ncapable of even 'low stress'" work because of her constant pain and loss of motor skills.  (Id. at 504-11).  In response to the very last question on the form,  Dr. Mazumdar stated, without any further explanation, that each of these symptoms and limitations applied to Johnston beginning in "[e]arly 2003."  (Id. at 510).

Contrary to this last response, the ALJ found that Dr. Mazumdar's opinions "more accurately reflecte[d Johnston's] current level of functioning" than her "condition prior to the date last insured."  (Id. at 28).  In arriving at this determination, the ALJ specifically noted the lack of any significant medical evidence ("even in Dr. Mazumdar's treating notes") that corroborated Dr. Mazumdar's assessment of Johnston's physical limitations during the relevant period stemming from her leukemia and stroke, or alleged pain and fatigue.[3]  (Id.).  Indeed, in 2004, Dr. Mazumdar repeatedly had assessed

---

[3]       As the Second Circuit has noted, the absence of evidence from the claimed period of disability may itself be considered substantial evidence.  See, e.g., Martin v. Astrue, 337 F.

(continued...)

Johnston's hypothyroidism and leukemia as being in remission.  (Id. at 223, 225, 229, 273).  Although Johnston had trouble walking during this period, (id. at 225-29), this was due to a meniscal tear in her right knee, (id. at 266-67), which was surgically repaired in 2004 or 2005.  (Id. at 225-26, 230, 421-22).  Moreover, while Dr. Mazumdar's 2012 assessment states that Johnston suffered chronic pain throughout her body preventing her from working during the relevant period, Johnston reported to Dr. Mazumdar in October 2006 that she only had pain and stiffness in her right knee.  (Id. at 220, 505).  During this same visit, Johnston presented as well developed, in no acute distress, without muscle atrophy or weakness, and with a normal gait and intact joints.  (Id. at 221; see also id. at 276).  Johnston also reported no neck pain at the time, in contrast to Dr. Mazumdar's 2012 assessment that Johnston's neck pain then contributed to her inability to work.  (Id. at 508; see also id. at 224, 226).  Furthermore, as the ALJ noted, although x-rays of Johnston's lumbar spine and hips taken in October 2006 revealed "evidence of mild ostopenia,"[4] "follow-up was not recommended until three to five years later," implying that the condition was not severe.  (Id. at 27, 260-61).  Thereafter, during a November 2010 examination with Dr. Scott Russinoff, Johnson reported having experienced hip

---

[3](...continued)
App'x 87, 89 (2d Cir. 2009) ("[A] lack of evidence of severe impairment constitutes substantial evidence supporting a denial of benefits"); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say.").

[4]        "Osteopenia" is defined as either "[d]ecreased calcification or density of bone," or "[r]educed bone mass due to inadequate osteoid synthesis." Stedman's Medical Dictionary (27th ed. 2000), available at Westlaw STEDMANS 289180.

pain for several years, (id. at 465-66), but the ALJ concluded that this did not limit her ability to perform basic work activities prior to her date last insured because she had been regularly working, albeit on a part-time basis, between 2006 and 2011. (See id. at 27, 41, 43). The ALJ also noted that Johnston was the principal caregiver for her three minor children during the relevant period. (See id. at 27, 46-47).[5] This evidence, taken together, was more than sufficient for the ALJ to conclude that Dr. Mazumdar's opinion was entitled to little weight. Johnston's assertion that the ALJ failed to justify the limited weight that he accorded to Dr. Mazumdar's opinion is therefore wholly misplaced. (Id. at 27-28).

Other record evidence also supports the ALJ's decision to discount Dr. Mazumdar's opinion. For example, notwithstanding Dr. Mazumdar's statement that Johnston's disability precluded her from using her extremities, (id. at 507-08), Dr. Mazumdar's examinations during the claimed period of disability revealed no weakness in Johnston's extremities and intact joints. (See id. at 218-19, 220-21). Additionally, despite Dr. Mazumdar's assessment that Johnston was experiencing severe pain during the relevant period, Johnston was not prescribed pain medication at that time. (See, e.g., id. at 48, 219).

---

[5]   Although the ALJ described Johnston as the "sole caregiver" for her three children, she testified that this was her role when her husband was not available. (R. 46). Accordingly, she probably is more accurately described as their principal caregiver during the relevant period. Among other things, she would make lunches for her children, take them to the bus, walk back home, and prepare dinner. (Id. at 39, 47-48).

In sum, the ALJ's decision to discount Dr. Mazumdar's opinion because it was contradicted by other evidence is clearly supported by substantial evidence, much of which was cited by the ALJ. Consequently, the treating physician rule is not a basis for setting aside the ALJ's decision.

B.   Johnston's RFC

Johnston next contends that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to cite to "any specific medical facts or non-medical evidence" leading to his conclusions. (Pl.'s Mem. at 11). As the applicable regulations recognize, a claimant's "impairment(s), and any related symptoms such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC represents "the most [the claimant] can still do despite [her] limitations." Id. To pass muster, the ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Here, the ALJ concluded that Johnston retained the residual functional capacity to perform light work during the relevant period. (R. 25). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Even though the weight to be lifted may be "very little," a job still falls within this category if it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing

and pulling of arm or leg controls." <u>Id.</u>  The ALJ found in that regard that Johnston had

the RFC to perform light work,

> except . . . [that she] could [only] lift and carry 10 pounds
> frequently and 15 pounds occasionally; [and that she] could
> stand and walk in 30-minute intervals for a total of six hours in
> an eight-hour workday; . . . could sit in one-hour intervals for a
> total of six hours in an eight-hour workday; . . . could
> occasionally push, pull, bend, and stoop; [but] . . . could never
> balance or kneel; and . . . must avoid heights and temperature
> extremes.

(R. 25).

   Contrary to Johnston's assertions, the ALJ's conclusions regarding

Johnston's RFC are supported by substantial evidence that the ALJ specifically identified.

At the hearing, Johnston testified that as of January 2006 she had a host of conditions that

substantially limited her ability to work.  For example, she stated that she had "bad

balance," weakness on her right side, including a weak right hand, and lower back and

neck pain.  (<u>Id.</u> at 45-49).  Johnston stated further that these impairments rendered her

unable to use her right hand to carry objects, and limited her to lifting at most five

pounds, sitting for no more than forty-five minutes, walking for no more than fifteen to

twenty minutes, and standing for ten to fifteen minutes.  (<u>Id.</u> at 46, 48-49).  She also

indicated that she had trouble bending at her knees and waist, and was experiencing

increased difficulty with her memory.  (<u>Id.</u> at 48, 53).

   The ALJ acknowledged that, in 2004, Johnston had experienced knee pain

and difficulty walking, and was diagnosed with a meniscal tear.  (<u>Id.</u> at 27; <u>see also</u> <u>id.</u> at

225, 227, 229-30, 266).  As the ALJ noted, however, Johnston underwent knee surgery in

2004 or 2005, and did not complain again about any knee problems until late 2006, when

she reported pain and stiffness, but then subsequently failed to raise any issues regarding

her knee in 2007, during treatment for an unrelated ear condition.  (See id. at 27, 218-19,

220, 225, 275-79).  Additionally, bone scans conducted during this period revealed

osteopenia but were otherwise normal, (id. at 260-65), and a physical examination in

2007 showed no muscle atrophy or weakness, intact joints, and a normal gait.  (Id. at

276).

   The non-medical evidence cited by the ALJ further buttresses his RFC

determination.  As the ALJ noted, in 2006 – the very year Johnston alleges her disability

began – she started working part-time as a substitute school nurse.  Indeed, she held that

job throughout her period of alleged disability, stopping only after she fractured her wrist

in late 2011.  (See id. at 27, 41, 43, 417, 513-26).  Johnston also was the principal

caregiver for her three young children, performed volunteer work once per month, "was

able to perform personal care activities independently and on a daily basis,"  and took

only over-the-counter medications for pain – a fact the ALJ found "inconsistent with the

alleged significant pain and limitations."  (Id. at 28, 45, 48, 50).

   Significantly, Johnston does not assert that the record relating to the

relevant period is incomplete or that the ALJ failed to develop it adequately.

Accordingly, the absence of contemporaneous medical records evidencing a disability,

combined with the non-medical evidence reflecting activities of daily living that were

inconsistent with Johnston's disabilities claim, were more than enough evidence upon which the ALJ reasonably could conclude that Johnson was not disabled prior to her date last insured.  Johnston's RFC claim thus does not warrant a remand.

      C.    <u>Credibility Assessment</u>

Johnston next challenges the ALJ's assessment of her credibility. Specifically, Johnston alleges that (1) the ALJ failed to adequately explain his conclusion that her subjective statements concerning her condition during the relevant period were not fully credible, and (2) improperly relied on only her knee and hip impairments and the evidence of her daily activities in reaching his credibility determination.  (Pl.'s Mem. at 13-15).

The analysis at Step Four of the disability determination involves a two-part inquiry.  First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. <u>Sarchese v. Barnhart</u>, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing 20 C.F.R. §§ 404.1529(b), 416.929(b) and SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)).  Then, if the claimant makes statements about her symptoms that are not substantiated by the objective medical evidence, the ALJ must make a finding as to the claimant's credibility and determine the extent to which her symptoms truly limit her ability to perform basic work activities.  <u>Sarchese</u>, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.  Although the ALJ must "take the claimant's reports of pain and other limitations into account, he or she is not require[d] to accept the claimant's

16

subjective complaints without question."  Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir.

2012) (internal citations and quotation marks omitted).  "Rather, the ALJ 'may exercise

discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record.'"  Id. (quoting Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)).

A federal court consequently must afford great deference to the ALJ's credibility finding

so long as it is supported by substantial evidence.  Bischof v. Apfel, 65 F. Supp. 2d 140,

147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6

(S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination because he

heard plaintiff's testimony and observed his demeanor.").

> In making a credibility determination, an ALJ must consider:
>
> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, the claimant has received; (6) any other measures the claimant employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms.

Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing C.F.R.

§ 404.1529(c)(3)(i)-(vii)).  The ALJ, however, need not discuss all of these factors "as

long as the decision includes precise reasoning, is supported by evidence in the case

record, and clearly indicates the weight the ALJ gave to the claimant's statements and the

reasons for that weight."  Felix v. Astrue, No. 11 Civ. 3697 (KAM), 2012 WL 3043203,

at *8 (E.D.N.Y. July 24, 2012) (citations omitted).  The ALJ therefore "has the discretion

to evaluate the credibility of a claimant and to arrive at an independent

judgment . . . regarding the true extent of the pain alleged."  Martinez v. Astrue, No. 10

Civ. 9284 (PKC), 2012 WL 4761541, at *11 (S.D.N.Y. Aug. 1, 2012) (internal quotation

marks omitted).

   Here, the ALJ determined that Johnston's "medically determinable

impairment could reasonably be expected to cause the alleged symptoms," but that, her

"statements concerning the intensity, persistence and limiting effects of these symptoms"

were not consistent with the medical evidence and thus were "not fully credible."  (Id. at

26, 28).  Johnston raises several challenges to this conclusion.

   Johnston first contends that the ALJ failed to give appropriate reasons for

discounting her statements concerning her condition during the period in question.  (Pl.'s

Mem. at 13).  A review of the ALJ's decision, however, reveals a variety of specific

reasons – many recounted previously – for his rejection of certain of Johnston's

subjective assertions.  Included among these reasons was the fact that she claimed to have

become disabled during the very year she began working as a part-time substitute school

nurse (id. at 27, 41); her acknowledgment that she was the principal caregiver to her three

children during the period in question (id. at 27, 46); her volunteer work (id. at 28, 45);

her ability to perform activities of daily living adequately (id. at 28, 50); her lack of need

for prescription pain medication (id. at 28, 48); and her seemingly faulty memory

concerning her medical history.  (Id. at 28).  The last of these factors was predicated on a

18

document that Johnston evidently prepared for one of her doctors in which she claimed to have had her right meniscus repaired in 1995, even though, other medical records showed that this actually occurred in 2004 or 2005.  (Id. (citing id. at 421-22)).  Each of these bases for the ALJ's credibility determination comes directly from the record; collectively, they unquestionably constitute substantial evidence from which the ALJ reasonably could have decided to discount Johnston's statements concerning the intensity, persistence, and limiting effects of her symptoms during the relevant period.

Johnston further challenges the ALJ's finding that, contrary to her assertions, her hip and knee impairments resulted in only minimal limitations during the relevant period.  (Pl.'s Mem. at 13).  In particular, Johnston contends that the ALJ's credibility finding is contradicted by Dr. Mazumdar's 2012 opinion.  (Id.).  In her view, the ALJ thus improperly substituted his own expertise for that of a physician who had submitted a contrary opinion.  In advancing this argument, Johnston relies on Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) and Wagner v. Secy. of Health & Human Servs., 906 F.2d 856 (2d Cir. 1990).  In both of these cases, however, the opinions of the treating physicians were not contradicted by substantial evidence.  See Balsamo, 142 F.3d at 81; Wagner, 906 F.2d at 862.  Here, by comparison, Dr. Mazumdar's opinion is contradicted by substantial evidence.  As noted previously, the contemporaneous medical records for the relevant period simply do not reflect medical treatment for conditions or limitations as severe as Johnston describes.  Rather, Johnston's earlier records, insofar as relevant, reflect treatment for only mild or moderate conditions concerning her right knee and hips.

(See e.g., id. at 220-21).  Had Johnston been suffering in 2006 and 2007 to the extent she

was in later years, it is reasonable to expect her earlier records would have reflected the

alleged severity of her condition.  (Compare, e.g., R. 300-01 (2006 imaging study

showing "normal" hips), with id. at 320-21 (2010 imaging study showing "obvious

developmental dysplasia of the [left] hip"), 323 (2011 examination impression showing

"gait difficulty" as a result of, inter alia, "left hip pain due to significant arthritis and

bursitis") and 395 (2012 full body bone scan showing multifocal degenerative joint

disease)).  Moreover, the only test results that Dr. Mazumdar referred to in the

questionnaire that she prepared more than five years after Johnston's date last insured as

support for her diagnosis consisted of unspecified "bloodwork" and EKGs.  Suffice it to

say, Johnston has not pointed to any such studies that support Dr. Mazumdar's opinion

concerning Johnston's RFC in 2006 and 2007.  Consequently, the ALJ's conclusion that

Johnston had the RFC to perform light work was reasonable and is supported by

substantial evidence.

Finally, Johnston attacks the ALJ's reliance on her ability to work part-time

and engage in various activities during the period of alleged disability as a basis for

discounting her credibility.  (Pl.'s Mem. at 14).  Specifically, Johnston notes that her part-

time job as a school nurse did not rise to the level of substantial gainful activity for

purposes of Step Two of the disability analysis, and that she performed each activity upon

which the ALJ relied with significant limitations.  (Id.).  Johnston's ability to work part-

time, however, remains evidence that the ALJ may consider in determining the severity of

Johnston's impairment.  See C.F.R. § 404.1529(c)(3) ("We will consider all of the

evidence presented, including information about your prior work record . . . .").

Furthermore, even if Johnston could perform her activities only with limitations, this, too,

would plainly be information that the ALJ properly could consider in determining her

RFC.  See id.  Johnston's assertion that the ALJ improperly relied on such evidence in

assessing her credibility therefore is unavailing.  See 20 C.F.R. § 404.1529(c)(4).

        D.    New and Material Evidence

        Johnston's final contention is that a remand is warranted based on the new

evidence presented to the Appeals Council.  (Pl.'s Mem. at 15-16).  Under 42 U.S.C.

§ 405(g), a court may order the Commissioner to consider additional evidence "upon a

showing that there is new evidence which is material and that there is good cause for the

[claimant's] failure to incorporate such evidence into the record in a prior proceeding."

Nonetheless, "[n]ew and material evidence will provide a basis for the Appeals Council to

change the ALJ's decision only where it relates to the period on or before the date of the

ALJ hearing decision."  Laderson v. Astrue, No. 10 Civ. 7797 (RPP), 2011 WL 6083189,

at *8 (S.D.N.Y. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)) (internal

quotation marks and brackets omitted).  In addition, the Appeals Council may grant a

request for review only when it concludes that the ALJ's "action, findings, or conclusion

is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).

        In connection with her application for Appeals Council review, Johnston

submitted a letter from Dr. Mazumdar dated January 3, 2013.  (R. 579-81).  On March 8,

2013, however, the Appeals Council denied Johnston's request for review, finding the new information did not provide a basis for changing the ALJ's decision.  (Id. at 1-2).  In its decision, the Appeals Council noted that Johnston's new information related to a time period later than the date of the ALJ's decision.  (Id. at 2).  Indeed, the bulk of the letter addresses findings and events long after Johnston's date last insured.

To the extent that Dr. Mazumdar's letter addresses the relevant period, it simply rehashes the statements made in her earlier questionnaire responses.  The letter fails, however, to set forth any new objective medical evidence from the period of claimed disability to support Dr. Mazumdar's opinion that Johnston has been "unable to perform any kind of competitive work on a sustained basis since at least February 2003." (Id. at 581).

In short, to the extent the letter discusses the period after 2007, Dr. Mazumdar's opinions are immaterial, and to the extent it discusses the relevant time period, her opinions are cumulative.  Moreover, even if the letter spoke to the issues raised by Johnston's application for SSD and was not merely cumulative, Johnston was represented by counsel at the ALJ hearing.  Johnston consequently cannot show good cause for failing to incorporate any new evidence into her prior submissions to the ALJ, since any such information would have been available at that time.  (See R. 579-81).  It follows that Johnston is not entitled to have this case remanded so that the ALJ can consider Dr. Mazumdar's letter.

VI.    Conclusion

For the foregoing reasons, Johnston's motion for judgment on the pleadings (ECF No. 14) should be denied, and the Commissioner's cross-motion (ECF No. 27) should be granted.

VII.    Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for extension of time for filing objections must be directed to Judge Caproni.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:       New York, New York
             February 13, 2015

             _____
                      FRANK MAAS
             United States Magistrate Judge


Copies to all counsel via ECF

23